**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| STEVEN GOMO, RICHARD CLIFTON, EDWARD DEENIHAN, DANIEL WARMENHOVEN, ROBERT SALMON, TOM GERSTENBERGER, AND TOM GEORGENS,<br><br>Plaintiffs,<br><br>v.<br><br>NETAPP, INC., a Delaware Corporation, and NETAPP, INC. EXECUTIVE RETIREE HEALTH PLAN,<br><br>Defendants. | Case No. 17-cv-02990-BLF<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: ECF 55, 71]<br><br>**[REDACTED]** |

Plaintiffs are former employees of Defendant NetApp, Inc. ("NetApp" or "the company") who claim that they are entitled to "lifetime" medical benefits under the NetApp, Inc. Executive Retiree Health Plan ("the Plan"), a welfare benefit plan governed by ERISA.[1]  The Plan was created in 2005 to provide NetApp's most senior executives with lifetime medical benefits, paid for entirely by the company, upon retirement.  In 2016, NetApp amended the Plan, changing it from a fully-insured health plan to a reimbursement arrangement for the period January 1, 2017 through December 31, 2019, and terminating the Plan effective December 31, 2019.  Plaintiffs contend that they have a vested interest in lifetime medical benefits under the Plan and that Defendants do not have legal authority to terminate the Plan.  In the alternative, Plaintiffs assert that if the Plan can be terminated, Defendants breached fiduciary duties by misrepresenting the terms of the Plan.

---

[1] Employee Retirement Income Security Act of 1974.

The parties have filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56. Having considered the briefing and the oral argument presented at the hearing on June 13, 2019, the Court GRANTS Defendants' motion and DENIES Plaintiffs' motion.

## I.  BACKGROUND

### Creation of the Plan

The Plan was created in response to concerns raised by Jeff Allen, NetApp's Chief Financial Officer ("CFO"), in 2003. Warmenhoven Decl. ¶ 2, ECF 56-3. Allen was contemplating retirement but he was worried about obtaining private medical insurance in light of ████████████████████ *Id*. Daniel Warmenhoven, the company's Chief Executive Officer ("CEO"), tasked the Human Resources Department and the Compensation Committee ("Comp Committee") to work on creating a medical insurance plan for senior executives at Allen's level. *Id*. Warmenhoven believed that such a plan would not only address Allen's concerns but also would be a significant incentive for top executives to remain at NetApp in the competitive Silicon Valley environment. Warmenhoven Decl. ¶ 8. After approximately two years, the Comp Committee adopted the Plan, effective May 1, 2005. Warmenhoven Decl. ¶ 3.

### Power Points

A two-page Power Point presentation was created, highlighting the terms of the Plan. Warmenhoven Decl. ¶ 3 & Exh. 1 (May 2005 Power Point), ECF 56-3. The Power Point stated that the Plan provides medical coverage "as a fully-insured plan" to "Retired 16b officers"[2] with a minimum of five years of service and a minimum age of 50, whose age plus years of service doubled is equal to or greater than 65. *Id*. The Power Point indicated that the Plan was insured through the CIGNA HealthCare Open Access Plus plan for Retirees; premiums would be paid by the company; and participants would be entitled to an "Unlimited lifetime maximum benefit" for themselves and their families. *Id*. Finally, the Power Point stated that any company acquiring NetApp would be required to provide the same or equivalent Plan "for the lives of the eligible employees." *Id*.

---

[2] *See* Securities and Exchange Act of 1934, § 16(b), 15 U.S.C. § 78p(b).

Updated versions of the original May 2005 Power Point were provided to senior executives as they became eligible to participate in the Plan. *See, e.g.,* Warmenhoven Decl. ¶ 9 & Exh. 4 (March 2014 Power Point), ECF 56-3; Salmon Decl. ¶ 2 & Exh. 1 (August 2009 Power Point), ECF 56-4; Deenihan Decl. ¶ 2 & Exh. 1 (Undated Power Point), ECF 56-5; Georgens Decl. ¶ 3 & Exh. 1 (February 2012 Power Point), ECF 56-6; Gerstenberger Decl. ¶ 3 & Exh. 1 (December 2015 Power Point), ECF 56-7; Clifton Decl. ¶ 2 & Exh. 1 (March 2013 Power Point), ECF 56-8. While all versions of the Power Point indicated that the Plan provides lifetime medical benefits, some versions stated so expressly: "Plan provides medical benefits for the retiree's lifetime." Georgens Decl. Exh. 1 (February 2012 Power Point), ECF 56-6; Gerstenberger Exh. 1 (December 2015 Power Point), ECF 56-7; Clifton Decl. Exh. 1 (March 2013 Power Point), ECF 56-8. The parties agreed at the hearing that for purposes of the cross-motions for summary judgment, all the Power Points may be considered materially identical with respect to the language providing for lifetime medical benefits.

*Insurance Certificates*

CIGNA was the original Plan underwriter. Kurose Decl. ¶ 7 & Exh. 5, ECF 73. CIGNA issued a Certificate of Coverage effective May 1, 2005, the date the Plan took effect, and it periodically issued new Certificates of Coverage, including for years 2009, 2010, 2011, and 2012. *See* Kurose Decl. ¶¶ 7-11 & Exhs. 5-9.

Effective January 1, 2013, United Healthcare ("UHC") replaced CIGNA as the Plan underwriter. Kurose Decl. ¶ 12 & Exh. 10, ECF 73. UHC issued a Certificate of Coverage effective January 1, 2013, and it issued new Certificates of Coverage for years 2014, 2015, and 2016. Kurose Decl. ¶¶ 10-15 & Exhs. 10-13.

The legal significance of these Certificates is disputed by the parties, as discussed below.

*Plan Participants*

Jeff Allen, who is not a party to this suit, was the only Plan participant from 2005 through 2011. Warmenhoven Decl., ¶¶ 4, 7, ECF 56-3. Plaintiff Steven Gomo, who served as the company's Executive Vice President of Finance and Chief Financial Officer from 2004 until his retirement at the end of 2011, became the second Plan participant to receive benefits, starting in

3

2012. Gomo Decl. ¶¶ 2-3, ECF 56-2. Plaintiff Edward Deenihan, the company's Senior Vice President for Global Sales from 2000 to 2003 and Executive Vice President for Global Services from 2003 until his retirement in September 2013, began receiving Plan benefits in 2013. Deenihan Decl. ¶¶ 2-4, ECF 56-5. Plaintiff Daniel Warmenhoven, NetApp's CEO at the time of his retirement, became a Plan beneficiary in 2014. Warmenhoven Decl. ¶ 9, ECF 56-3. Plaintiff Tom Georgens, who succeeded Warmenhoven as CEO in 2009 and served in that position until his retirement, began receiving Plan benefits in 2015. Georgens Decl. ¶ 2, ECF 56-6. Plaintiff Richard Clifton, an Executive Vice President for Customer Success, began participating in the Plan upon his retirement in 2015. Clifton Decl. ¶ 2, ECF 56-8. Plaintiff Tom Gerstenberger became a Plan participant upon his retirement in July 2016. Gerstenberger Decl. ¶ 2, ECF 56-7.

Plaintiff Robert Salmon signed a severance agreement with NetApp in 2016 and began working for another company. Salmon Suppl. Decl. ¶¶ 2-3, ECF 81-2. His severance agreement provided that he "will receive executive retiree medical benefits." Salmon Suppl. Decl. Exh. 1. Salmon has not enrolled in the Plan, and he is receiving medical benefits from his current employer. Kurose Decl. ¶ 22. He nonetheless claims that he is entitled to lifetime medical benefits under the Plan. Salmon Suppl. Decl. ¶¶ 2-3.

*2016 Amendment to the Plan*

In 2016, NetApp amended the Plan effective January 1, 2017, changing it "from a fully-insured health plan through which benefits were provided under a group health insurance policy to a self-funded health reimbursement arrangement ('HRA') that reimburses eligible retirees' premium payments for individual insurance covering the retirees and their dependents during the period from January 1, 2017 through December 31, 2019." Kurose Decl. ¶ 19 & Exh. 14 (Consolidated Plan and Summary Plan Description), ECF 73. NetApp retained a concierge broker service to help Plan participants find suitable individual health insurance policies. *Id.* As amended, the Plan will terminate at the end of 2019, at which time NetApp will provide each retiree participant a lump sum equal to two years of projected health care premium costs. *Id.* Under the amended the Plan, NetApp's obligations to retiree participants will be completed upon the payment of the lump sum. *Id.* NetApp issued a Consolidated Plan and Summary Plan

4

1   Description, effective January 1, 2017, memorializing the amendments to the Plan.  Kurose Decl.

2   Exh. 14 (Consolidated Plan and Summary Plan Description), ECF 73.

3          Plaintiffs sue NetApp and the Plan, asserting two claims under ERISA.  In Claim 1,

4   brought under ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Plaintiffs seek a

5   determination that they are entitled to lifetime medical benefits under the Plan.  In Claim 2,

6   brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs assert that if they are not

7   entitled to lifetime medical benefits, Defendants breached fiduciary duties by misrepresenting the

8   terms of the Plan, thus entitling them to equitable relief.

9   **II.    LEGAL STANDARD**

10          "A party is entitled to summary judgment if the 'movant shows that there is no genuine

11  dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of*

12  *Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ.

13  P. 56(a)).  "The moving party initially bears the burden of proving the absence of a genuine issue

14  of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

15          "Where the moving party meets that burden, the burden then shifts to the non-moving

16  party to designate specific facts demonstrating the existence of genuine issues for trial."  *In re*

17  *Oracle Corp.*, 627 F.3d at 387.  "[T]he non-moving party must come forth with evidence from

18  which a jury could reasonably render a verdict in the non-moving party's favor."  *Id*.  "The court

19  must view the evidence in the light most favorable to the nonmovant and draw all reasonable

20  inferences in the nonmovant's favor."  *City of Pomona*, 750 F.3d at 1049.  "Where the record

21  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

22  genuine issue for trial."  *Id*. (internal quotation marks and citation omitted).

23  **III.   DISCUSSION**

24          Before turning to the parties' substantive arguments, the Court addresses Defendants'

25  request for judicial notice and Plaintiffs' evidentiary objections.  Next, the Court discusses the

26  legal requirements for establishment of an ERISA plan.  Finally, the Court takes up the parties'

27  arguments with respect to Claims 1 and 2.

28

**A.**     **Defendants' Request for Judicial Notice / Plaintiffs' Evidentiary Objections**

**1.**     **Defendants' Request for Judicial Notice**

Defendants have filed a request for judicial notice ("RJN") of twelve documents.  *See* Defs.' RJN, ECF 77.  Exhibits 1-8 to the RJN are excerpts of SEC filings reflecting Plaintiffs' compensation.  Exhibits 9-11 are excerpts of SEC filings reflecting cost-saving measures undertaken by NetApp.  Exhibit 12 is a fact sheet regarding young adults and the Affordable Care Act, published online by the United States Department of Labor.

Plaintiffs object to the RJN, arguing that all of the documents are irrelevant to the issues before the Court on the cross-motions and should be excluded under Federal Rule of Evidence 401.  Plaintiffs also argue that the documents reflecting their compensation should be excluded as prejudicial under Federal Rule of Evidence 403.

SEC filings and documents published by a government agency generally are subject to judicial notice.  *See Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1043 (9th Cir. 2015) (judicial notice of publicly filed SEC documents is proper); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (granting judicial notice of information contained on a government website).  The documents are relevant to Defendants' position that the Plan was terminated in response to changing economic conditions, and they are not unduly prejudicial to Plaintiffs.  Accordingly, Defendants' request for judicial notice is GRANTED.

**2.**     **Plaintiffs' Evidentiary Objections**

Plaintiffs object to several other documents submitted by Defendants.  First, Plaintiffs object to the expert report of Curtis R. Donley, who has "been retained to provide an opinion on common practices with respect to documentation for fully-insured employer-sponsored health plans."  Kang Decl. Exh. 3 (Donley Report) at ¶ 6, ECF 72-3.  Mr. Donley also has "been asked to review certificates of coverages and PowerPoint presentations relating to the Plan and to provide an opinion about the customary usage of these types of documents" based on his thirty-five years of experience in the field of employee benefits.  *Id*.  Plaintiffs contend that Mr. Donley's opinions on these topics are excludable under Federal Rule of Evidence 702, because he is being asked to opine regarding the ultimate legal issue of what Plan documents control.  This objection is

1  OVERRULED.  Mr. Donley's opinions as to industry practice are appropriate and within the

2  scope of his expertise.

3     Plaintiffs also raises a Rule 702 objection to Mr. Donley's expert rebuttal report on the

4  basis that it discusses a report of Plaintiffs' expert which has not been submitted into evidence.

5  *See* Kang Decl. Exh. 4 (Donley Rebuttal Report), ECF 72-4.  This objection is OVERRULED.

6  The Court will disregard irrelevant portions of the report, if any.

7     Plaintiffs object to statements by Defendants' witnesses Lesley Kurose and Nancy

8  Saunders, in which they refer to the Certificates of Coverage as Plan documents.  *See* Kurose

9  Decl. ¶¶ 7-15, ECF 73; Saunders Decl. ¶¶ 3, 11, ECF 74.  Lesley Kurose is NetApp's Senior

10  Director of Global Benefits, and Nancy Saunders is NetApp's Vice President of Human

11  Resources.  Both have personal knowledge regarding the manner in which the Certificates of

12  Coverage were treated by the Benefits and Human Resources departments, i.e., as Plan documents.

13  These objections are OVERRULED.

14    **B.**  **Welfare Benefit plans**

15     "ERISA was enacted in 1974 to govern the administration of two kinds of employee

16  benefit plans: welfare benefit plans and pension benefit plans."  *Pisciotta v. Teledyne Indus., Inc.*,

17  91 F.3d 1326, 1329 (9th Cir. 1996).  Pension benefit plans provide retirement income or result in

18  deferral of income, while welfare benefit plans provide additional benefits such as life insurance

19  or disability coverage.  *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015).

20     The parties do not agree on which ERISA provision governs the creation of an ERISA

21  plan, or what features a document must have in order to qualify as an ERISA plan.  Plaintiffs

22  argue that the relevant statute is 29 U.S.C. § 1002(1), while Defendants argue that 29 U.S.C. §

23  1102(b) controls.  The Court agrees with Defendants that § 1102(b) controls, and it explains below

24  why Plaintiffs' reliance on § 1002(1) is misplaced.

25     The Ninth Circuit has held expressly that pursuant to § 1102(b), "ERISA requires that

26  every employee benefits plan include (1) a procedure for establishing and carrying out a funding

27  policy, (2) the procedure for the allocation of responsibilities for operation and administration of

28  the plan, (3) a procedure for amending the plan and the identity of persons with the authority to do

so, and (4) the basis on which payments are made to and from the plan." *Mull for Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1209 (9th Cir. 2017) (citing 29 U.S.C. § 1102(b)); *see also Cinelli*, 61 F.3d at 1441 (9th Cir. 1995) (listing same four requirements for ERISA plan). A document that does not meet all four requirements does not constitute an ERISA plan. *Mull*, 865 F.3d at 1209-10. However, an ERISA plan may be comprised of two documents that together meet the four requirements of § 1102(b). *Id*.

"Unlike pension plans, welfare plans are not subject to the vesting requirements of ERISA." *Cinelli*, 61 F.3d at 1441. "Because benefits under a welfare plan are generally neither vested nor accrued, an employer may amend or terminate benefits pursuant to the terms of the plan at any time." *Id*. "It is accepted, however, that the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated." *Id*. (internal quotation marks and citation omitted). "A contractual agreement for vesting of benefits must be found in the plan documents." *Id*.

## C.    Claim 1 for Benefits under the Plan

In Claim 1, Plaintiffs seek a determination that they have a vested right in lifetime medical benefits under the Plan. The claim is brought under ERISA section 502(a)(1)(B), which authorizes a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Both sides seek summary judgment on this claim.

### 1.    The Plan Documents

In order to determine whether the Plan documents contain a contractual agreement for vesting of lifetime medical benefits, the Court must identify the Plan documents. Plaintiffs argue that the Power Points constitute the Plan. Defendants argue that the Certificates of Coverage constitute the Plan.

#### a.    Power Points

The Court first considers whether the Power Points qualify as Plan documents. They are missing at least two of the four required elements under 29 U.S.C. § 1102(b), as they do not

United States District Court
Northern District of California

address allocation of responsibilities for operation and administration of the Plan, nor do they disclose the procedure for amending the Plan and the identity of persons with authority to amend. *See Mull*, 865 F.3d at 1209; *see also* 29 U.S.C. § 1102(b). In *Mull*, the Ninth Circuit found that a Trust Agreement meeting three of the four requirements did not qualify as an ERISA plan because it did not meet the fourth requirement. *Mull* 865 F.3d at 1209. Similarly, in *Cinelli*, the Ninth Circuit found that the "Security Pacific Board Resolution" and the "Flamson letter" did not qualify as plan documents under ERISA because they "contained no information on amendment procedures" and did not "describe a procedure for plan operation and administration." *Cinelli*, 61 F.3d at 1442. For the same reasons, this Court concludes that the Power Points are not the Plan.

Plaintiffs do not contend that the Power Points meet the § 1102(b) requirements for an ERISA plan. Instead, they argue that § 1102(b) – titled "Requisite features of plan" – is irrelevant to determining the requisite features of a plan. According to Plaintiffs, a document need only have the features described in 29 U.S.C. § 1002 – titled "Definitions" – in order to constitute an ERISA plan. Under § 1002, the term "employee welfare benefit plan" is defined to "mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits. . . ." 29 U.S.C. § 1002(1). Based on that statutory definition, Plaintiffs argue that a document qualifies as an ERISA plan if it is: (1) a plan, fund or program (2) established (3) by an employer (4) for purposes of providing medical benefits (5) to participants or their beneficiaries. *See* Pls.' Reply at 2, ECF 81.

Plaintiffs' argument is contrary to the Ninth Circuit's holdings in *Mull* and *Cinelli*, discussed above. Plaintiffs rely primarily on Eleventh Circuit case, *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982). *Donovan* held that "a 'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id*. at 1373. The Court does not find the citation to *Donovan* persuasive in the face of more recent

1    Ninth Circuit authority to the contrary.  This is particularly true given the Ninth Circuit's

2    observation in *Cinelli* that "*Donovan* is limited to instances where a formal plan is absent and the

3    question remains whether a de facto plan has been created."  *Cinelli v. Sec. Pac. Corp.*, 61 F.3d at

4    1443.  In the present case, the parties agree that there is a formal ERISA plan – the dispute is what

5    documents constitute the Plan.  Accordingly, *Donovan* does not apply.

6           Plaintiffs argue that "[t]he Ninth Circuit has adopted the *Donovan v. Dillingham* standard,"

7    citing *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 546 F.3d 639, 651 (9th Cir. 2008).

8    *See* Pls.' Reply at 2, ECF 81.  In *Golden Gate*, the Ninth Circuit observed that it had relied on the

9    *Donovan* criteria in three cases, including *Scott v. Gulf Oil Corp.*, 754 F.2d 1499 (9th Cir.1985),

10   another case upon which Plaintiffs rely in their briefing.  The Ninth Circuit stated in *Golden Gate*

11   that, "In *Scott*, we relied on the criteria set forth in *Donovan* to hold that an agreement to provide

12   severance pay to terminated employees at a rate of two weeks' salary for each year of employment

13   was sufficient to establish an ERISA plan."  *Golden Gate*, 546 F.3d at 652.  However, the Ninth

14   Circuit opined that "[t]he outcome of *Scott* is almost certainly no longer good law in light of the

15   Supreme Court's subsequent decisions. . . ."  *Id*.  The Ninth Circuit observed that in another case,

16   *Winterrowd v. American General Annuity Ins. Co.*, 321 F.3d 933 (9th Cir. 2003), it held that

17   "satisfying the *Donovan* criteria was a necessary but not sufficient condition for the creation of an

18   ERISA plan."  *Golden Gate*, 546 F.3d at 652.  Nothing in the *Golden Gate* decision suggests that

19   *Donovan* is controlling here.

20          Plaintiffs rely heavily on another out-of-circuit case, *Deboard v. Sunshine Min. & Ref. Co.*,

21   208 F.3d 1228 (10th Cir. 2000).  In *Deboard*, the Tenth Circuit found that letters from the

22   employer to employees offering a lifetime guarantee of insurance benefits, "satisfied the minimum

23   requirements for establishing an ERISA plan."  *Id*. at 1238.  *Deboard* might appear persuasive at

24   first blush given that the plaintiffs in that case, like Plaintiffs here, asserted that informal

25   documents constituted an ERISA plan with vested lifetime insurance benefits.  However, upon

26   closer examination it is clear that *Deboard* is distinguishable from the present case.

27          In *Deboard*, the employer sent its employees letters offering a lifetime guarantee of

28   insurance benefits to those persons who took voluntary early retirement.  *Deboard*, 208 F.3d at

10

1232-34. Based upon the representations in the letters, the plaintiffs voluntarily retired. *Id.* at 1233-34. The employer subsequently discontinued payment of insurance premiums on behalf of the plaintiffs, stating that the plaintiffs must pay future premiums in order to retain insurance coverage. *Id.* at 1234. The plaintiffs filed suit under ERISA, and the district court granted them partial summary judgment based on its conclusion that the employer's letters created a new welfare benefit plan under ERISA. *Id.* at 1237.

The Tenth Circuit agreed, finding that the "letters satisfied the minimum requirements for establishing an ERISA plan." *Id.* at 1238. That conclusion was based in part on the Tenth Circuit's observations that "[n]ot only did the letters specify a funding mechanism for the plan (i.e., that Woods would pay the health insurance premiums), they also allocated ongoing operational and administrative responsibilities to the employer." *Id.* at 1238-39. Those are, nearly verbatim, two of the requirements for establishment of an ERISA plan under 29 U.S.C. § 1102(b), as recited by *Mull* and *Cinelli*. The Tenth Circuit's articulation of those criteria therefore does little to convince this Court that reliance on *Mull* and *Cinelli* is in error.

The *Deboard* court found that the letters standing alone established a new plan, and that the employer's assertion that its pre-existing welfare benefit plan applied was unsupported by the record. *See Deboard*, 208 F.3d at 1238. In the present case, however, the Power Points standing alone do not satisfy the requirements of an ERISA plan, and the record evidence establishes that the Power Points expressly referenced the CIGNA and UHC policies as the source of benefits. Finally, there is no evidence that Plaintiffs in the present case traded early retirement for coverage under the plan, as in *Deboard*. These significant factual differences distinguish *Deboard* from the present case. This Court concludes that, applying the Ninth Circuit standards articulated in *Mull* and *Cinelli* to the facts presented here, the Power Points are not the Plan. The Power Points are merely informal documents that summarized benefits then being offered under the Plan.

### b. Certificates of Coverage

The Court next considers whether the Certificates of Coverage qualify as Plan documents. Again, the elements required to establish an ERISA plan are "(1) a procedure for establishing and carrying out a funding policy, (2) the procedure for the allocation of responsibilities for operation

United States District Court
Northern District of California

and administration of the plan, (3) a procedure for amending the plan and the identity of persons

with the authority to do so, and (4) the basis on which payments are made to and from the plan."

*Mull*, 865 F.3d at 1209 (citing 29 U.S.C. § 1102(b)).

The CIGNA and UHC Certificates satisfy all four requirements.[3]  With respect to the first

and fourth elements, the Certificates provide a procedure for establishing and carrying out a

funding policy, and specify the basis on which payments are made to and from the Plan.  Each of

the CIGNA Certificates "certifies that it insures certain Retirees for the benefits provided by the

following policy(s)."  Kurose Decl. Exh. 5 (CIGNA 2005 Certificate) at NETAPP 42; Exh. 6

(CIGNA 2009 Certificate) at NETAPP 106; Exh. 7 (CIGNA 2010 Certificate) at NETAPP 176;

Exh. 8 (CIGNA 2011 Certificate) at NETAPP 248; Exh. 9 (CIGNA 2012 Certificate) at NETAPP

317, ECF 73.  The UHC Certificates explain that benefits are provided pursuant to identified

policies obtained by NetApp from UHC.  *See* Kurose Decl. Exh. 10 (UHC 2013 Certificate) at

NETAPP 554; Exh. 11 (UHC 2014 Certificate) at NETAPP 718; Exh. 12 (UHC 2015 Certificate)

at NETAPP 885; Exh. 13 (UHC 2016 Certificate) at NETAPP 926.

As Plaintiffs point out, the CIGNA Certificates incorrectly state that the cost of the Plan is

shared by the employee and the employer, when in fact the cost of the Plan is paid solely by

NetApp.  *See* Kurose Decl. Exh. 5 (CIGNA 2005 Certificate) at NETAPP 59; Exh. 6 (CIGNA

2009 Certificate) at NETAPP 58; Exh. 7 (CIGNA 2010 Certificate) at NETAPP 60; Exh. 8

(CIGNA 2011 Certificate) at NETAPP 58; Exh. 9 (CIGNA 2012 Certificate) at NETAPP 59, ECF

73.  The UHC Certificates also state that the employee must pay a portion of the Plan costs.  *See*

Kurose Decl. Exh. 10 (UHC 2013 Certificate) at NETAPP 418; Exh. 11 (UHC 2014 Certificate) at

NETAPP 597; Exh. 12 (UHC 2015 Certificate) at NETAPP 762; Exh. 13 (UHC 2016 Certificate)

at NETAPP 928.  The Court agrees with Defendants that this inconsistency is immaterial.  There

---

[3] Plaintiffs argue that the CIGNA Certificates are irrelevant here because none of the Plaintiffs began participating in the Plan while CIGNA was the insurer.  However, Plaintiff Gomo entered the plan in 2012 following his retirement at the end of 2011.  *See* Gomo Decl. ¶¶ 3-5, ECF 56-2. CIGNA provided the Plan benefits for 2012, and it was not replaced by UHC until 2013.  *See* Kurose Decl. Exh 9 (CIGNA 2012 Certificate), Exh. 10 (UHC 2013 Certificate), ECF 73. Moreover, the fact that the CIGNA 2005 Certificate was issued contemporaneously with the May 2005 creation of the Plan supports Defendants' position that the Certificates are the Plan documents.

12

is no dispute that NetApp and all Plan participants understood that the Plan was fully insured through coverage purchased first from CIGNA and later from UHC. Plaintiffs do not contend that the erroneous statements regarding employee responsibility for costs led to confusion as to whether Plan participants actually had to pay costs.

With respect to the second element, the Certificates describe allocation of responsibilities for operation and administration of the Plan. The CIGNA Certificates identify NetApp as the Plan sponsor and NetApp's Chief Legal Counsel as the Plan administrator, and include a section on "Discretionary Authority" delegating to CIGNA responsibility for determining eligibility for benefits and resolving claims. Kurose Decl. Exh. 5 (CIGNA 2005 Certificate) at NETAPP 92-93; Exh. 6 (CIGNA 2009 Certificate) at NETAPP 159-60; Exh. 7 (CIGNA 2010 Certificate) at NETAPP 231-32; Exh. 8 (CIGNA 2011 Certificate) at NETAPP 301-03; Exh. 9 (CIGNA 2012 Certificate) at NETAPP 371-72, ECF 73. Most of the UHC Certificates similarly identify NetApp as the Plan sponsor and Plan administrator, and delegate to UHC the responsibility for claims processing, claims payment, and handling appeals. *See* Kurose Decl. Exh. 10 (UHC 2013 Certificate) at NETAPP 554; Exh. 11 (UHC 2014 Certificate) at NETAPP 718; Exh. 12 (UHC 2015 Certificate) at NETAPP 885. The UHC 2016 Certificate does not identify NetApp by name as the Plan sponsor and Plan administrator, but it makes clear that the "Enrolling Group" is responsible for enrollment in the plan and payment to UHC, while UHC is responsible for claims processing. *See* Kurose Decl. Exh. 13 (UHC 2016 Certificate) at NETAPP 984-86.

Finally, with respect to the third element, the Certificates explain how the Plan may be amended and identify persons with the authority to do so. The CIGNA Certificates provide that: "The Employer as Plan Sponsor reserves the right to, at any time, change or terminate benefits under the Plan, to change or terminate the eligibility of classes of employees to be covered by the Plan, to amend or eliminate any other plan term or condition, and to terminate the whole plan or any part of it." Kurose Decl. Exh. 5 (CIGNA 2005 Certificate) at NETAPP 92; Exh. 6 (CIGNA 2009 Certificate) at NETAPP 302; Exh. 7 (CIGNA 2010 Certificate) at NETAPP 231; Exh. 8 (CIGNA 2011 Certificate) at NETAPP 302; Exh. 9 (CIGNA 2012 Certificate) at NETAPP 371, ECF 73. The UHC Certificates contain similar provisions permitting amendment or termination

of the Plan. *See* Kurose Decl. Exh. 10 (UHC 2013 Certificate) at NETAPP 473 ("To the extent permitted by law we reserve the right, in our sole discretion and without your approval, to change, interpret, modify, withdraw or add Benefits or terminate the Policy."); Exh. 11 (UHC 2014 Certificate) at NETAPP 719 ("Your employer, as the Plan Sponsor, has the right to amend or terminate this Plan at any time."); Exh. 12 (UHC 2015 Certificate) at NETAPP 886 ("Your employer, as the Plan Sponsor, has the right to amend or terminate this Plan at any time."); Exh. 13 (UHC 2016 Certificate) at NETAPP 986 ("To the extent permitted by law, we reserve the right to change, modify, withdraw or add Benefits or terminate the Policy.").

Plaintiffs argue that the Certificates cannot be the Plan documents because the titles of the plans referenced in the Certificates do not match the title of the Plan at issue here. For example, the CIGNA 2005 Certificate of Coverage refers to both the "Open Access Plus Medical Benefits Retiree Medical Plan" and the "Network Appliance Inc Group Welfare Plan." *See* Kurose Decl. Exh. 5 (CIGNA 2005 Certificate) at NETAPP 34, 91. As Defendants point out, the Power Points themselves were inconsistent with respect to the Plan name, although those differences were more minor than the differences between the Plan names in the Power Points and the Plan names in the Certificates. *See, e.g.,* Warmenhoven Decl. Exh. 1 (May 2005 Power Point) ("Executive Retirement Medical Plan"), ECF 56-3; Warmenhoven Decl. Exh. 4 (March 2014 Power Point) ("Executive Medical Retirement Plan"), ECF 56-3; Salmon Decl. Exh. 1 (August 2009 Power Point) ("Executive Retiree Medical Plan"), ECF 56-4. Moreover, the original May 2005 Power Point expressly referenced the "Open Access Plus Medical Benefits Retiree Medical Plan" named in the CIGNA 2005 Certificate. *See* Warmenhoven Decl. Exh. 1 (May 2005 Power Point), ECF 56-3; Kurose Decl. Exh. 5 (CIGNA 2005 Certificate) at NETAPP 34. All of the Power Points indicated that the Plan was fully insured, and specified the insurer as either CIGNA or UHC. Accordingly, the fact that the CIGNA and UHC Certificates did not accurately reflect the name of the Plan is immaterial.

Plaintiffs contend that the Certificates contain boilerplate provisions that do not apply to the unique Plan offered to NetApp's most senior executives. While the Certificates do reference many circumstances that would not be expected to apply to senior executives – for example, a

14

beneficiary's military leave of absence – Defendants note that the Plan covers not only senior executives, but also their dependents, to whom such provisions may apply.

To the extent Plaintiffs contend that the CIGNA and UHC Certificates are completely unrelated to the Plan, and relate instead to policies covering the general NetApp workforce, that contention is belied by the record. Nancy Saunders, NetApp's Vice President of Human Resource, testified that NetApp did not purchase insurance coverage for its general workforce, and that the plan applicable to the general workforce is self-funded. Saunders Dep. 114:3-7, Kang. Suppl. Decl. Exh. 1, ECF 83-1. Ms. Saunders testified that the Certificates reflect the insurance coverage purchased specifically to provide benefits under the Plan. *Id.* Ms. Saunders also stated in her declaration and supplemental declaration that the Certificates were provided by CIGNA and UHC in connection with the Plan and were treated by NetApp as the Plan documents. Saunders Decl. ¶ 3, ECF 74; Saunders Suppl. Decl. ¶¶ 2-3, ECF 84.

The Court is satisfied that the Certificates are the source of benefits under the Plan, that the Certificates meet the requirements for an ERISA plan, and that the inconsistencies pointed out by Plaintiffs are immaterial.

### 2. No Vested Right to Lifetime Benefits

The Court's determination that the Certificates are the Plan documents is fatal to Plaintiffs' claim that they have a vested right to lifetime medical benefits. As discussed above, welfare benefit plans generally may be amended or terminated at any time. *See Cinelli*, 61 F.3d at 1441. While an employer may provide for vesting of benefits in plan documents, there is no provision in the Certificates guaranteeing lifetime medical benefits for Plan participants. To the contrary, the Certificates contain express provisions permitting amendment or termination. *See* Kurose Decl. Exh. 5 (CIGNA 2005 Certificate); Exh. 6 (CIGNA 2009 Certificate); Exh. 7 (CIGNA 2010 Certificate); Exh. 8 (CIGNA 2011 Certificate); Exh. 9 (CIGNA 2012 Certificate); Exh. 10 (UHC 2013 Certificate); Exh. 11 (UHC 2014 Certificate); Exh. 12 (UHC 2015 Certificate); Exh. 13 (UHC 2016 Certificate), ECF 73.

Plaintiffs argue that Defendants cannot establish that they reserved the right to terminate the Plan, because Defendants never prepared and distributed a Summary Plan Description

reflecting such reservation of rights.  Under ERISA, "an employer must provide employees with a written Summary Plan Description ('SPD') which describes the employees' plan." *Pisciotta*, 91 F.3d at 1329.  Plaintiffs have it backward.  Defendants do not need to establish that they reserved the right to terminate the Plan – under the law, the default is that an employer may terminate a welfare benefit plan at any time. *See Cinelli*, 61 F.3d at 1441.  It is Plaintiffs who need to establish the existence of a contractual agreement for vesting of benefits in the plan documents. *See id.*  As discussed above, Plaintiffs have not done so.  The Court concludes that the provision of "lifetime" benefits, without more, is not a clear disavowal of Defendants' express reservation of the right to change or terminate benefits at any time set forth in the Plan documents.

The Court notes that Defendants contend that the Certificates were both the Plan and the SPD.  Defendants submit the testimony of Ms. Saunders that the Certificates served as the SPD.  Saunders Dep. 128:7-14, Kang Decl. Exh. 9, ECF 72.  They also submit the opinion of their industry expert, Curtis R. Donley, that "it is considered common within the industry in fully-insured benefit arrangements for the insurer's certificate of coverage to serve as the plan sponsor's written plan document and summary plan description for a 'welfare benefit plan.'"  Donley Report ¶ 9, Kang Decl. Exh. 3, ECF 72.  The Court need not determine whether the Certificates constitute the SPD for purposes of adjudicating the parties' motions with respect to Claim 1.  Even if Defendants failed to provide a SPD, such failure would not result in the substantive relief sought by Plaintiffs.  As the Ninth Circuit held in *Pisciotta*:  "Nor does the fact that Teledyne failed to produce a SPD to the district court for the time period between 1977 to 1987 mean that Appellants are entitled to lifetime medical benefits.  Any ERISA claimant who suffers because of a fiduciary's failure to comply with ERISA's procedural requirements is ordinarily not entitled to a substantive remedy such as the retroactive reinstatement of benefits." *Pisciotta*, 91 F.3d at 1330.

Defendants have established that the Plan did not create a vested interest in lifetime medical benefits and did not restrict Defendants' ability to amend or terminate the Plan, thereby demonstrating their entitlement to summary judgment on Claim 1.  Plaintiffs have failed to show the existence of any disputed facts that would preclude summary judgment for Defendants on Claim 1.  Accordingly, Defendants' motion for summary judgment is GRANTED as to Claim 1

and Plaintiffs' motion for summary judgment is DENIED as to Claim 1.

**D.     Claim 2 for Breach of Fiduciary Duties**

In Claim 2, Plaintiffs contend that NetApp breached its fiduciary duties "[b]y falsely representing the nature of benefits to be provided by [the Plan] if, in fact, they were not lifetime benefits but were subject to amendment or cancellation at the whim of the employer, NetApp." Compl. ¶ 24.  Plaintiffs seek equitable relief for this alleged breach.  The claim is brought under ERISA § 502(a)(3), which authorizes a plan participant or beneficiary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).

Both sides seek summary judgment on this claim.  The Court first discusses the applicable legal standards, and then it turns to the parties' arguments.

**1.     Breach of Fiduciary Duties under § 1132(a)(3)**

In order to prevail on a claim under § 1132(a)(3), "a plaintiff who is a participant, beneficiary, or fiduciary must prove both (1) that there is a remediable wrong, i.e., that the plaintiff seeks relief to redress a violation of ERISA or the terms of a plan; and (2) that the relief sought is appropriate equitable relief."  *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 954 (9th Cir. 2014) (internal quotation marks and citations omitted).

In *CIGNA Corp. v. Amara*, the Supreme Court identified three types of such traditional equitable remedies that may be available under § 1132(a)(3):  reformation, equitable estoppel, and surcharge.  563 U.S. 421, 440-42 (2011).  The Ninth Circuit discussed the three remedies and offered additional guidance in *Gabriel*.  *See Gabriel*, 773 F.3d at 955-58.  The Ninth Circuit observed that the Supreme Court has drawn heavily on trust law doctrine in interpreting ERISA, likening the ERISA plan fiduciary to a trustee and the ERISA plan to a trust.  *Id*. at 954-55.

"First, appropriate equitable relief may include the reformation of the terms of the plan, in order to remedy the false or misleading information provided by a plan fiduciary."  *Gabriel*, 773 F.3d at 955 (internal quotation marks and citation omitted).  "The power to reform contracts is available only in the event of mistake or fraud."  *Id* "A plaintiff may obtain reformation based on

17

United States District Court
Northern District of California

1    mistake in two circumstances: (1) if there is evidence that a mistake of fact or law affected the

2    terms of a trust instrument and if there is evidence of the settlor's true intent; or (2) if both parties

3    to a contract were mistaken about the content or effect of the contract and the contract must be

4    reformed to capture the terms upon which the parties had a meeting of the minds." *Id.* (internal

5    quotation marks, citation, and alterations omitted). "Under a fraud theory, a plaintiff may obtain

6    reformation when either (1) a trust was procured by wrongful conduct, such as undue influence,

7    duress, or fraud, or (2) a party's assent to a contract was induced by the other party's

8    misrepresentations as to the terms or effect of the contract and he was justified in relying on the

9    other party's misrepresentations." *Id.*

10   "Second, appropriate equitable relief may include the remedy of equitable estoppel, which

11   holds the fiduciary to what it had promised and operates to place the person entitled to its benefit

12   in the same position he would have been in had the representations been true." *Gabriel*, 773 F.3d

13   at 955 (internal quotation marks and citation omitted). "Under this theory of relief: (1) the party

14   to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must

15   so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must

16   be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Id.*

17   (internal quotation marks and citation omitted). "[T]o maintain a federal equitable estoppel claim

18   in the ERISA context, the party asserting estoppel must not only meet the traditional equitable

19   estoppel requirements, but must also allege: (1) extraordinary circumstances; (2) that the

20   provisions of the plan at issue were ambiguous such that reasonable persons could disagree as to

21   their meaning or effect; and (3) that the representations made about the plan were an interpretation

22   of the plan, not an amendment or modification of the plan." *Id.* at 957.

23   "Third, appropriate equitable relief also includes surcharge," that is, "monetary

24   'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's

25   unjust enrichment." *Gabriel*, 773 at 957 (internal quotation marks and citation omitted). "[T]o

26   obtain relief by surcharge for a breach of the ERISA trustee's duties, a plan participant or

27   beneficiary must show that the violation injured him or her, but need only show harm and

28   causation, not detrimental reliance." *Id.* at 957-58.

### 2. "Top-Hat" Plan

Before discussing the parties' arguments with respect to the elements of a § 1132(a)(3) claim, the Court addresses Defendants' argument that the claim is precluded because the Plan is a "top-hat" plan. "ERISA exempts top-hat plans from the fiduciary, funding, participation and vesting requirements applicable to other employee benefit plans." *Duggan v. Hobbs*, 99 F.3d 307, 310 (9th Cir. 1996). "A top-hat plan is defined in ERISA as 'a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.'" *Id*. (quoting 29 U.S.C. § 1101(a)(1)).

While there is no dispute that the Plan is unfunded, and that it is limited to a "select group of management or highly compensated employees," the parties disagree whether the Plan is maintained "primarily for the purpose of providing deferred compensation." Defendants assert that "deferred compensation" is not defined in the statute, and they argue that the term encompasses welfare benefit plans. However, Defendants have not cited, and the Court has not discovered, any case according top-hat status to a retiree welfare benefit plan such as the one at issue here. Defendants cite a regulation promulgated by the Department of Labor in 1975, exempting welfare benefit plans from certain reporting and disclosure requirements under ERISA. *See* 29 C.F.R. § 2520.104-24. While the language used in the regulation is similar to that used in § 1101(a)(1), the regulation does not indicate that welfare benefit plans provide "deferred compensation" as that term is used in § 1101(a)(1).

The Supreme Court has rejected the premise that retiree benefits are a form of deferred compensation, concluding that Congress determined otherwise in ERISA. *M & G Polymers*, 135 S. Ct. at 933. "In ERISA, Congress specifically defined plans that 'resul[t] in a deferral of income by employees' as pension plans, § 1002(2)(A)(ii), and plans that offer medical benefits as welfare plans, § 1002(1)(A)." *Id*. "Thus, retiree health care benefits are not a form of deferred compensation." *Id*. Although it was not addressing the scope of top-hat plans, the Supreme Court's clear rejection of the notion that retiree health care benefits can be viewed as deferred compensation is extremely persuasive. Consequently, absent any case applying § 1101(a)(1) to a

plan such as the one at issue here, the Court concludes that the Plan is not a top-hat plan.

Defendants therefore are not entitled to summary judgment based on their theory that the Plan is a top-hat plan.

### 3. Remediable Wrong

Turning to the elements of Plaintiffs' claim under § 1132(a)(3), the first element is a "remediable wrong," that is, "a violation of ERISA or the terms of a plan." *Gabriel*, 773 F.3d at 954. Claim 2 of the complaint identifies ERISA section 404(a)(1) as the provision that was violated. Compl. ¶ 24. Section 404(a)(1) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C.A. § 1104(a). Plaintiffs allege that Defendants breached that provision by "falsely representing the nature of benefits to be provided." Compl. ¶ 24. In their motion, Plaintiffs assert that NetApp breached its fiduciary duties when "[f]or over 11 years NetApp repeatedly promised lifetime medical benefits." Pls.' Motion at 17, ECF 56.

Defendants argue that Plaintiffs cannot establish a breach of fiduciary duties based on this theory. The evidence in the record shows that NetApp initially intended to provide lifetime medical benefits to Plan participants. That intent was evidenced by the Power Points discussed at length above, as well as contemporaneous SEC filings stating that NetApp was providing lifetime medical benefits to qualifying executives as a method to retain senior executives. *See* Martin Decl. ¶¶ 11-17 & Exhs. 10-16, ECF 56-1. Defendants present evidence that providing lifetime medical benefits seemed feasible for the first several years – in fiscal year 2011 the projected liabilities for the Plan were only $5.5 million. *See* Saunders Decl. Exh. 10 at NETAPP 1964, ECF 68-12. As more senior executives eligible to participate in the Plan retired, the projected liabilities for the Plan increased. *See id.* By the end of 2016, the Plan had a projected future liability of approximately $26 million. *Id.* During the same time frame, NetApp announced that it would lay off 500 employees. Defs.' RJN Exh. 9, ECF 77. NetApp was "under incredible pressure from [its] shareholders to reduce the cost structure of the company." Kurian Dep. 58:5-7, Kang Decl. Exh. 12, ECF 72-12. NetApp "looked at every conceivable aspect of the company" to try to reduce costs. *Id.* 58:20-22. At an August 2016 meeting, NetApp announced that the Plan would

20

have to be amended, and ultimately terminated, due to escalating liabilities.  Saunders Decl. ¶ 16, ECF 74.

An employer's honest statements of present intention to provide benefits at a particular level do not give rise to liability for breach of fiduciary duties, simply because the employer later changes the benefits.  *See Frahm v. Equitable Life Assur. Soc. of U.S.*, 137 F.3d 955, 960 (7th Cir. 1998) (no breach of fiduciary duty where employer "did not set out to deceive or disadvantage plan participants").  Plaintiffs have not submitted any evidence, and none appears in the record, suggesting that NetApp did not intend to provide lifetime medical benefits under the Plan when it was adopted.  NetApp's decision to terminate the Plan more than a decade later does not render its earlier conduct fraudulent.

The cases cited by Plaintiffs do not hold to the contrary.  In *Amara*, the district court determined that the employer failed to give plan participants notice of changes in their benefits, in violation of its fiduciary obligations.  *Amara*, 563 U.S. at 425.  The question on appeal was whether ERISA authorized the form of relief granted by the district court.  *Id.*  The Supreme Court held that it did not, but it articulated three forms of equitable relief available for breach of fiduciary duties under ERISA:  reformation, equitable estoppel, and surcharge.  *Amara*, 563 U.S. at 440-42.  In *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1184 (9th Cir. 2004), a breach of fiduciary duty was found when the employer communicated misinformation that induced the plaintiffs to retire.  Here, Plaintiffs have not presented evidence of a breach of fiduciary duties.

To the extent Plaintiffs argue that Defendants breached fiduciary duties by failing to disclose their authority to amend or terminate the Plan, such argument is not supported by this record.  At least some of the Plan participants supervised the creation of the Plan.  All of the Plan participants were sophisticated senior executives who served NetApp as CEOs, CFOs, or executive Vice Presidents.  The Power Points clearly stated that the Plan was fully insured and referenced either CIGNA or UHC as the insurer.  Plaintiffs therefore were on notice that their benefits were governed by insurance documents, and they do not dispute that insurance documents were available for their review at any time.  As the Ninth Circuit held in *Pisciotta*, a reservation of rights contained in the Plan document is effective if the document was available for review by any

21

1    employee who wished to see it.  *Pisciotta*, 91 F.3d at 1331.  It is implausible to suggest that the

2    CEO, CFO, and senior Vice Presidents could not review the documents upon request and

3    Plaintiffs do not argue to the contrary.

4          In fact, it is undisputed that Plaintiffs were provided with a "retirement package" which

5    generally included the Certificates of Coverage.  Saunders Decl. ¶ 5, ECF 74.  Plaintiffs concede

6    in their reply brief that "upon nearing retirement they were provided a plethora of paperwork

7    which often included the UHC Certificates."  Pls.' Reply at 8, ECF 81.  As discussed above, the

8    Certificates contained unambiguous language granting Defendants authority to modify or

9    terminate the Plan.  On this record, no reasonable trier of fact could conclude that NetApp misled

10   Plaintiffs – sophisticated individuals who held the most senior executive positions at the company

11   – regarding the nature of the benefits offered under the Plan.

12         Defendants have demonstrated that Plaintiff cannot show a remediable wrong, and

13   Plaintiffs have not presented evidence sufficient to create disputed facts.  Accordingly,

14   Defendants' motion for summary judgment is GRANTED as to Claim 2 and Plaintiffs' motion for

15   summary judgment is DENIED as to Claim 2.

16                    **4.**      **Appropriate Equitable Relief**

17         Having concluded that Defendants are entitled to summary judgment based on lack of

18   evidence of a remediable wrong, the Court need not address the parties' arguments regarding

19   appropriate equitable relief for such wrong.

20                    **5.**      **Plaintiff Salmon's Standing**

21         Similarly, the Court need not determine whether Plaintiff Salmon has standing to sue, as

22   even if he does have standing Defendants are entitled to summary judgment.  The Court observes,

23   however, that a § 1132(a)(3) claim may be brought by "a plaintiff who is a participant,

24   beneficiary, or fiduciary" of the Plan.  *Gabriel*, 773 F.3d at 954.  It appears that Salmon is eligible

25   to become a Plan participant or beneficiary based on the language of his severance agreement

26   providing that he "will receive executive retiree medical benefits."  Salmon Suppl. Decl. Exh. 1.

27   However, Salmon has not enrolled in the Plan.  Kurose Decl. ¶ 22.  He therefore is not a Plan

28   participant or beneficiary.  He does not contend that he is a Plan fiduciary.  Because Salmon is not

a participant, beneficiary, or fiduciary under the Plan, he lacks standing to proceed, and summary judgment against him is warranted on that basis as well.

## IV.    ORDER

Defendants' motion for summary judgment is GRANTED, and Plaintiffs' motion for summary judgment is DENIED.

Dated:  September 9, 2019

BETH LABSON FREEMAN
United States District Judge