**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>DANIEL WARMENHOVEN,<br><i>Plaintiff-Appellant</i>,<br><br>v.<br><br>NETAPP, INC.; NETAPP EXECUTIVE<br>MEDICAL RETIREMENT PLAN,<br><i>Defendants-Appellees.</i></td><td>No. 19-16960<br><br>D.C. No.<br>5:17-cv-02990-<br>BLF<br><br>OPINION</td></tr>
</table>

Appeal from the United States District Court
for the Northern District of California
Beth Labson Freeman, District Judge, Presiding

Argued and Submitted February 10, 2021
San Francisco, California

Filed September 13, 2021

Before: Morgan Christen and Bridget S. Bade, Circuit
Judges, and Gary Feinerman,[*] District Judge.

Opinion by Judge Feinerman

---

[*] The Honorable Gary Feinerman, United States District Judge for
the Northern District of Illinois, sitting by designation.

## SUMMARY**

### ERISA

The panel affirmed in part and vacated in part the district court's summary judgment in favor of defendants on retired executives' claims that termination of the NetApp Executive Medical Retirement Plan violated ERISA because they had been promised lifetime benefits.

Only one plaintiff appealed. The panel affirmed the district court's judgment as to plaintiff's direct claim for benefits under 29 U.S.C. § 1132(a)(1)(B). The panel held that the default rule under ERISA is that employers may freely terminate welfare benefit plans. The panel concluded that PowerPoint presentations summarizing the Plan for participating executives did not override the default rule, where certificates of insurance coverage included provisions granting NetApp the authority to terminate benefits under the Plan at any time. The panel held that the PowerPoint presentations were not Plan documents because they did not qualify as written instruments under 29 U.S.C. § 1102(b), and they therefore could not vest lifetime benefits.

The panel vacated the judgment as to plaintiff's alternative claim for equitable relief under 29 U.S.C. § 1132(a)(3) and remanded for further proceedings on that claim. Plaintiff alleged that, if the Plan did not grant him vested lifetime benefits, then NetApp misrepresented the nature of the Plan in the PowerPoints, in violation of the fiduciary duties it owed as a Plan administrator. The panel

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held that the district court erred in in granting summary judgment on the ground that NetApp did not commit a remediable wrong under 29 U.S.C. § 1104(a)(1) by failing to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries. Disagreeing with the Seventh Circuit, the panel held that there is no intentional deceit requirement under § 1104(a)(1). The panel further held that the district court erred in concluding that the fiduciary duty claim failed because plaintiff could have examined the certificates of insurance to dispel any misunderstanding arising from the PowerPoints. The panel concluded that plaintiff did not forfeit any argument on the remedy prong of his claim for equitable relief, an issue not reached by the district court.

## COUNSEL

J. Phillip Martin (argued) and Eric C. Kastner, Kastner Kim LLP, Mountain View, California; Robert L. Rusky, San Francisco, California; for Plaintiff-Appellant.

Laurie J. Hepler (argued), Greines Martin Stein & Richland LLP, San Francisco, California; Clarissa A. Kang and Angel L. Garrett, Trucker Huss, San Francisco, California; for Defendants-Appellees.

## OPINION

FEINERMAN, District Judge:

In 2005, NetApp, Inc. created the NetApp Executive Medical Retirement Plan, an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, to provide health insurance benefits to its retired senior executives. In 2016, NetApp implemented a phased termination of the Plan. Daniel Warmenhoven and six other retired executives sued NetApp and the Plan (together, "NetApp"), alleging that terminating the Plan violated ERISA because they had been promised lifetime benefits. The suit asserted two distinct ERISA claims: (1) a direct claim for benefits under § 1132(a)(1)(B); and (2) an alternate claim for equitable relief under § 1132(a)(3) to redress NetApp's alleged misrepresentations that the Plan would provide lifetime benefits. The district court granted summary judgment to NetApp on both claims.

Only Warmenhoven appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court's judgment as to Warmenhoven's § 1132(a)(1)(B) claim, vacate the judgment as to his § 1132(a)(3) claim, and remand for further proceedings on the § 1132(a)(3) claim.

## Background

### I.   The Plan's Creation and Termination

Warmenhoven was NetApp's Chief Executive Officer from 1994 to 2009 and, after stepping down as CEO, served as Executive Chairman of NetApp's Board of Directors until 2014, formally retiring in April 2015. In 2003, at the request of another senior NetApp executive, Warmenhoven asked

the company's Human Resources department to explore the creation of an executive retiree health plan. After extensive consideration, the Board's Compensation Committee adopted the Plan effective May 2005.

Some ten years later, in November 2015, the Compensation Committee decided to close the Plan to any new participants and to explore alternatives to the Plan for existing participants. At that time, nine executives and eighteen dependents were receiving health insurance benefits under the Plan. The parties' dispute over what motivated the Compensation Committee's decision— NetApp asserts that the Plan's increasing costs made the benefit unsustainable at a time when it was laying off thousands of employees, while Warmenhoven charges that NetApp's rationale was pretextual—is immaterial to this appeal.

In April 2016, the Compensation Committee decided to terminate the Plan. Under a new "Amended and Restated Plan," NetApp would reimburse participating retirees like Warmenhoven for the cost of purchasing health insurance themselves from 2017 through 2019, and then pay them a lump sum at the Plan's termination on December 31, 2019. NetApp management met with the retirees to inform them of the Amended Plan, and the retirees expressed their disapproval. Despite the opposition from retirees, NetApp went forward with the Amended Plan, giving formal notice to Warmenhoven by letter dated November 16, 2016. The Amended Plan took effect on January 1, 2017.

## II.  Documentation of the Plan's Terms

As discussed below, the default rule under ERISA is that employers may freely terminate welfare benefit plans like the Plan. *See* 29 U.S.C. § 1051(1) (exempting welfare

benefit plans from ERISA's vesting provisions). Warmenhoven filed this suit on the view that NetApp had promised him that the health insurance benefits offered under the Plan would last for his lifetime, overriding the default rule that welfare benefits do not vest.

To support his view, Warmenhoven relies primarily on a series of PowerPoint presentations that summarized the Plan for participating executives. Although at least seven versions of the PowerPoint were created over the years, Warmenhoven personally saw only two.

The first was an April 2005 PowerPoint created by NetApp Human Resources to describe the Plan to NetApp management, including Warmenhoven in his role as CEO. The PowerPoint stated that the Plan would provide medical coverage to "a defined group of retiring executives as a fully-insured plan." It also stated that any company acquiring NetApp would be required to provide an equivalent plan "for the lives of the eligible employees." NetApp does not dispute that, as the PowerPoint suggested, it intended as of April 2005 to maintain the health insurance benefit for the participants' lifetimes.

The second version of the PowerPoint that Warmenhoven saw was a March 2014 version prepared shortly before his retirement. That version stated that the "Executive Medical Retirement Plan [was] adopted by [NetApp] as a method to retain a defined group of senior executives." In more explicit terms than the April 2005 version, the March 2014 version promised that the "Plan provides medical benefits for the retiree's lifetime" and that "[n]o retiree contributions [are] required."

As further support for his view that he had been promised lifetime benefits, Warmenhoven points to NetApp's public

disclosures in filings with the Securities and Exchange Commission ("SEC"). Like the PowerPoints, NetApp's SEC disclosures stated that the Plan would provide lifetime healthcare benefits to participants. For instance, a 2016 disclosure stated that "[c]overage continues through the duration of the lifetime of the retiree or the retiree's spouse, whichever is longer." The record does not contain evidence that Warmenhoven personally reviewed the SEC filings, but the filings do show that, as late as April 2016, NetApp was telling the public that it intended to cover its retired executives' healthcare for their lifetimes.

NetApp focuses attention on a third category of documents: the certificates of coverage prepared by the health insurance companies with which NetApp contracted to administer the Plan. NetApp hired Cigna to administer the Plan at its inception in 2005. Cigna composed a separate certificate for each year it administered the Plan, from 2005 to 2012. In 2013, NetApp replaced Cigna with UnitedHealthcare ("UHC"), and UHC composed certificates for the Plan from 2013 to 2016. As with the April 2005 and March 2014 PowerPoints, Warmenhoven personally received a copy of the 2015 UHC certificate.

The certificates of coverage primarily concerned the details, which are not pertinent here, of health coverage for the calendar year in question. The important provisions for present purposes addressed Plan administration: how coverage was paid for, who managed the Plan, and who had the authority to alter the Plan's terms. *See* 29 U.S.C. § 1102(b) (requiring that an ERISA plan's written instrument disclose this information). For example, the 2005 Cigna and 2015 UHC certificates each included a section devoted to those disclosures, titled "ERISA Required

Information" in the Cigna certificate and "ERISA Statement" in the UHC certificate.

Notably, each certificate of coverage included at least one provision granting NetApp the authority to terminate benefits under the Plan at any time—directly contradicting the PowerPoints' promises of lifetime benefits. For example, the ERISA disclosure in the 2005 Cigna certificate stated:

> The Employer as Plan Sponsor reserves the right to, at any time, change or terminate benefits under the Plan, to change or terminate the eligibility of classes of employees to be covered by the Plan, to amend or eliminate any other plan term or condition, and to terminate the whole plan or any part of it.

The 2015 UHC certificate likewise stated: "Your employer, as the Plan Sponsor, has the right to amend or terminate this Plan at any time."

## III.    Procedural History

Warmenhoven and six other retired executives filed this lawsuit in May 2017, bringing two claims under ERISA. The first claim alleged that the PowerPoints operated to vest lifetime benefits and sought recovery of those benefits directly under § 1132(a)(1)(B). The second claim, brought in the alternative to the first, arose under § 1132(a)(3), which allows suits for equitable relief to redress ERISA violations. The plaintiffs alleged that, if the Plan did not grant them vested lifetime benefits, then NetApp had misrepresented the nature of the Plan, in violation of the fiduciary duties it owed them as a plan administrator under § 1104(a)(1). Under the

second claim, the plaintiffs sought several forms of equitable relief: an injunction ordering continued benefits, reformation of the plan documents, estoppel, and surcharge.

After conducting discovery, the parties cross-moved for summary judgment. The district court granted NetApp's motion, denied the plaintiffs' motion, and entered judgment for NetApp. *Gomo v. NetApp, Inc.*, No. 17-cv-022990-BLF, 2019 WL 4346581, at *13 (N.D. Cal. Sept. 12, 2019). As to the § 1132(a)(1)(B) claim, the district court held that the PowerPoints were not "plan documents," and therefore that their language could not vest lifetime benefits. *Id.* at *5–6. Instead, the court held, the certificates of coverage were the controlling plan documents, and they allowed free amendment of the Plan. *Id.* at *7–9. As to the § 1132(a)(3) claim, the court held that NetApp had committed no breach of fiduciary duty because it had no intent to deceive and because the plaintiffs could have examined the certificates of coverage to dispel any misunderstanding arising from the PowerPoints. *Id.* at *11–13.

Six of the seven plaintiffs timely appealed. After a mediation conference, we granted the motions of five plaintiffs to dismiss their appeals. Warmenhoven, the sole remaining appellant, seeks reversal only of the grant of summary judgment to NetApp, not the denial of his summary judgment motion.

## Discussion

## I. Claim for Benefits Under § 1132(a)(1)(B)

Section 1132(a)(1)(B) "provides a right of action for plan participants or beneficiaries 'to recover benefits due . . . under the terms of [a] plan, to enforce [ ] rights under the terms of the plan, or to clarify [ ] rights to future benefits

under the terms of the plan.'" *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1213 (9th Cir. 2020) (alterations in original) (quoting 29 U.S.C. § 1132(a)(1)(B)), cert. granted, — S. Ct. —, 2021 WL 2742790 (July 2, 2021). The plaintiff bears the burden of proof on a § 1132(a)(1)(B) claim. *See Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

To avoid summary judgment on his § 1132(a)(1)(B) claim, Warmenhoven had to present evidence of a specific plan document that vested lifetime benefits. The Plan was a "welfare plan," which ERISA defines to include "any plan, fund, or program . . . maintained for the purpose of providing . . . medical, surgical, or hospital care or benefits." 29 U.S.C. § 1002(1). As noted, the default rule under ERISA provides that welfare plans do not vest and can be amended at any time: "Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *see* 29 U.S.C. § 1051(1) (providing that ERISA's vesting provisions "apply to any employee benefit plan . . . other than . . . an employee welfare benefit plan"). A plan may override this default rule, but only if it does so expressly in a plan document: "A contractual agreement for vesting of benefits must be found in the plan documents." *Cinelli v. Sec. Pac. Corp.*, 61 F.3d 1437, 1441 (9th Cir. 1995); *accord, e.g.*, *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994) ("[A]ny participant's right to a fixed level of lifetime benefits must be 'found in the plan documents and must be stated in clear and express language.'") (quoting *Wise v. El Paso Nat. Gas Co.*, 986 F.2d 929, 937 (5th Cir. 1993)).

"Plan document" is a term of art under ERISA. It does not mean *any* writing related to a plan; rather, it means the

formal "written instrument" that ERISA requires for each
employee benefit plan.  29 U.S.C. § 1102(a)(1) ("Every
employee benefit plan shall be established and maintained
pursuant to a written instrument."); *see Rhea v. Alan Ritchey,
Inc. Welfare Benefit Plan*, 858 F.3d 340, 344 (5th Cir. 2017)
("Courts often refer to written instruments as 'plan
documents.'").    To qualify as a written instrument, a
document must satisfy the four requirements of § 1102(b);
specifically, the document must "(1) provide a policy and a
method for funding the plan, (2) describe a procedure for
plan operation and administration, (3) provide a procedure
for amending the plan, and (4) specify a basis for payments
to and from the plan."   *Cinelli*, 61 F.3d at 1441 (quoting
*Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1523
n.1 (9th Cir. 1993)) (citing 29 U.S.C. § 1102(b)).  In a more
generic sense, the term "plan document" at times is used to
refer to the summary plan description ("SPD"), a less formal
document intended to give participants essential information
about their plan.  *See* 29 U.S.C. §§ 1022, 1024(b) (requiring
the plan administrator to furnish plan participants and
beneficiaries with an SPD containing certain categories of
information); *Prichard v. Metro. Life Ins. Co.*, 783 F.3d
1166, 1169 (9th Cir. 2015) ("[P]articularly in the context of
health plans, the SPD is sometimes argued to *be* the plan;
that is, to serve simultaneously as the governing plan
document.").  No party contends that any of the documents
at issue here functioned as an SPD for the Plan, so there is
no need to consider how the presence of an SPD among
those documents would affect the outcome of this appeal.
To avoid confusion, we will use the term "written
instrument"—the term used in ERISA—to refer to the
formal plan document required by § 1102(a)(1).    *See
Prichard*, 783 F.3d at 1169 (distinguishing the SPD from the
"formal plan document" required under § 1102(a)(1)).

Warmenhoven submits that the PowerPoint presentations were plan documents that could and did vest lifetime healthcare benefits. He does not argue, however, that the PowerPoints met the criteria for a written instrument under § 1102(b). Instead, he argues that NetApp's promises in the PowerPoints created an ERISA plan with lifetime benefits. To support that proposition, Warmenhoven relies on decisions such as *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982), *Scott v. Gulf Oil Corp.*, 754 F.2d 1499 (9th Cir. 1985), and *Golden Gate Restaurant Ass'n v. City and County of San Francisco*, 546 F.3d 639 (9th Cir. 2008).

Warmenhoven's argument is unpersuasive. As we explained in *Cinelli*, the line of cases he invokes governs "instances where a formal plan is absent and the question remains whether a de facto plan has been created." 61 F.3d at 1443. In *Scott*, for instance, the plaintiffs alleged that their employer made oral and written promises of severance pay. 754 F.2d at 1501. We concluded that such informal commitments to provide benefits could create an ERISA-governed plan in circumstances where there is no written instrument, lest "employers . . . escape ERISA's coverage merely by failing to comply with its requirements." *Id.* at 1503; *see also Donovan*, 688 F.2d at 1373 (holding that a plan exists, whether "pursuant to a writing or not," where "a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits"). However, in situations where the plan sponsor *has* prepared a written instrument, that line of decisions has no application. *See Golden Gate Rest. Ass'n*, 546 F.3d at 652 ("All of the cases applying the *Donovan* criteria address the question whether an informal, or de facto, ERISA plan has been established, and all involve some type of unwritten or informal promise made by an employer to its employees.").

Given the limited reach of the decisions he invokes, Warmenhoven must be understood as arguing that there was no ERISA-compliant written instrument for the Plan, and therefore that NetApp should be held to the less formal promises it made in the PowerPoints to provide lifetime health insurance benefits. *Cinelli* forecloses that theory by holding that only a written instrument satisfying the requirements of § 1102(b)—and not some other document—can vest lifetime benefits.

In *Cinelli*, an insurance policy certificate stated that the policy was terminable at any time, but a company board resolution stated that the benefit was fully vested. 61 F.3d at 1440–41. We noted that it was "clear that an insurance policy may constitute the 'written instrument' of an ERISA plan," and asked whether the board resolution was "also a plan document." *Id.* at 1441. We held that the board resolution was "not a plan document" because it did not meet the criteria for a written instrument set forth in § 1102(b). *Id.* at 1441–42, 1444. And because the resolution was not a written instrument, it was "extrinsic evidence" that could "not be used to alter the written terms of the plan," which provided that the life insurance benefit was terminable at any time. *Id.* at 1444.

The upshot of *Cinelli* is that only a written instrument satisfying the § 1102(b) criteria can vest lifetime benefits. And we have since reaffirmed *Cinelli*'s teaching that the § 1102(b) criteria, and only those criteria, govern which writings qualify as written instruments. *See Mull ex rel. Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1209 (9th Cir. 2017) (examining the § 1102(b) criteria to determine which documents were the written instrument); *accord*, *e.g.*, *Rhea*, 858 F.3d at 344 (holding that an SPD can qualify as a written instrument if it meets the § 1102(b)

criteria); *Gable*, 35 F.3d at 857 (applying § 1102(b) in holding that a schedule promising lifetime benefits was not a written instrument).

Ignoring these precedents, Warmenhoven does not argue that the PowerPoints met the four requirements for "plan documents" under § 1102(b). Indeed, he argues that the district court "fundamentally misconstrued ERISA's governing principles" in "relying on . . . § 1102(b)" to determine whether the PowerPoints were plan documents. As we have explained, the district court correctly looked to § 1102(b) to determine whether the PowerPoints were written instruments and thus whether they could vest lifetime benefits. By deliberately choosing to stand on his flawed argument that the PowerPoints created a vested ERISA plan without there being any written instrument, and by declining to argue in the alternative that he could prevail even if § 1102(b) applied, Warmenhoven has affirmatively waived any argument under the proper legal standard that the PowerPoints were written instruments. *See Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1152 (9th Cir. 2018) (per curiam) ("It is well established that an appellant's failure to argue an issue in the opening brief, much less on appeal more generally, waives that issue . . . ."); *Alvarez v. Lopez*, 835 F.3d 1024, 1028 (9th Cir. 2016) (finding an "intentional waiver" where the appellant "deliberately steered" the court away from an issue, thereby "preclud[ing] us from raising [the issue] sua sponte"). That waiver conclusively defeats his § 1132(a)(1)(B) claim because, under *Cinelli*, he bears

the burden to prove that a specific written instrument vested lifetime benefits.[1]

## II. Claim for Breach of Fiduciary Duty Under § 1132(a)(3)

Warmenhoven's second claim alleges in the alternative that, if the PowerPoint presentations did not vest lifetime benefits, he is entitled under § 1132(a)(3) to equitable relief to remedy NetApp's misrepresentations that the Plan's health benefits were permanent.    Section 1132(a)(3) provides:

> A civil action may be brought . . . (3) by a participant . . . (B) to obtain other appropriate

---

[1] Warmenhoven does not raise, and therefore has forfeited, any argument that the PowerPoint presentations and the certificates of coverage *combined* to form a written instrument under § 1102.  *See Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1019 (9th Cir. 2017) (holding that arguments that are not presented in appellate briefs are forfeited). We addressed a somewhat analogous argument in *Mull*.  There, participants in a health care plan sought a declaration that the plan could not enforce against them recoupment provisions found only in the SPD but not in the plan's trust agreement.  865 F.3d at 1209.  We held that because the trust agreement met only three of the four § 1102(b) criteria, it could not qualify on its own as the plan's written instrument. *Id.*  But because the SPD met the remaining criterion, we held that "the two documents *together* constitute[d] a plan," *id.* at 1209–10, and therefore that the SPD's recoupment provisions were enforceable, *id.* at 1210–11. Here, even if Warmenhoven had made an argument based on *Mull*, it would have failed on the merits because the district court correctly held that the certificates of coverage—which, as noted, expressly stated that the Plan could be terminated at any time—by themselves qualified as the Plan's written instrument under § 1102.  *See Prichard*, 783 F.3d at 1171 (holding that an insurance certificate was a plan's written instrument). Accordingly, there was no gap for the PowerPoint presentations to fill, meaning that the PowerPoints did not form part of a written instrument that could vest lifetime benefits.

> equitable relief (i) to redress [any act or
> practice which violates any provision of Title
> I of ERISA or the terms of the plan] or (ii) to
> enforce any provisions of [Title I] or the
> terms of the plan.

29 U.S.C. § 1132(a)(3). A § 1132(a)(3) claim has two elements: "(1) that there is a remediable wrong, *i.e.*, that the plaintiff seeks relief to redress a violation of ERISA or the terms of a plan; and (2) that the relief sought is appropriate equitable relief." *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 954 (9th Cir. 2014) (internal quotation marks and citations omitted). The district court limited its analysis to the first prong, granting NetApp summary judgment on the ground that no reasonable factfinder could find that NetApp committed a remediable wrong. 2019 WL 4346581, at *11–13. We disagree with the district court's conclusion on that issue and therefore vacate its grant of summary judgment to NetApp.

## A. Remediable Wrong

Warmenhoven's theory of remediable wrong is that NetApp, a plan fiduciary, misrepresented the Plan's terms by promising in the PowerPoints that the Plan provided lifetime benefits even though the written instrument included no such guarantee. Warmenhoven argues that NetApp thus violated § 1104(a)(1), which provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . ." 29 U.S.C. § 1104(a)(1).

As we have held, "fiduciaries breach their duties if they mislead plan participants or misrepresent the terms or administration of a plan." *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995) (per curiam). For

example, in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), a corporation spun off failing divisions into a new company and, despite knowing that the new company would likely fail, induced employees to transfer their benefits to the new company through false promises that the benefits would remain secure. *Id.* at 493–94. The Supreme Court held that the corporation's conduct violated its fiduciary duties as a plan fiduciary, reasoning that "[t]o participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'" *Id.* at 506 (quoting 29 U.S.C. § 1104(a)(1)).

In *Varity*, unlike here, the plan fiduciary intended to mislead plan participants to the fiduciary's benefit and the participants' detriment. That distinction grounded the district court's holding here that NetApp had committed no remediable wrong: "An employer's honest statements of present intention to provide benefits at a particular level do not give rise to liability for breach of fiduciary duties, simply because the employer later changes the benefits." *Gomo*, 2019 WL 4346581, at *12.

To support its holding, the district court relied heavily on *Frahm v. Equitable Life Assurance Society of the United States*, 137 F.3d 955, 960 (7th Cir. 1998), which held that *Varity* recognizes a § 1104(a)(1) fiduciary duty claim only in cases involving intentional deceit. The defendant in *Frahm* changed its retiree health plan to require retirees to bear more costs, and the retirees argued that the company had previously promised in oral statements and letters not to do so. *Id.* at 956–57. The Seventh Circuit held that such informal promises could not give rise to liability under § 1104(a)(1) unless the fiduciary "set out to deceive or disadvantage plan participants." *Id.* at 960. In so holding,

the Seventh Circuit relied on an analogy to tort law, noting that an estoppel defense or fraud claim requires "lies" where the speaker "actually had a different intention" than expressed. *Id.* at 961.

Our circuit's law holds otherwise. As a general matter, we have rejected the use of tort law to ground the § 1104(a) fiduciary duty, reasoning that the duty finds its roots in trust law, not tort law. *See King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 744 (9th Cir. 2017) ("The duty of loyalty is one of the common law trust principles that apply to ERISA fiduciaries, and it encompasses a duty to disclose." (quoting *Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 504 F.3d 818, 823 (9th Cir. 2007))); *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1183 (9th Cir. 2004) ("We fail to see the logic in transplanting the element of scienter from the tort of deceit into a statutory ERISA claim with roots in the law of fiduciaries and trusts."). Our approach aligns with the Supreme Court's understanding of ERISA fiduciary duties. *See Varity*, 516 U.S. at 496 ("[W]e recognize that [ERISA's] fiduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment.").

More to the point, we expressly rejected in *Mathews* the analogy to fraud that the Seventh Circuit found compelling in *Frahm*. The employer in *Mathews* argued that "the plaintiffs must show scienter as they would if they were suing under the common law cause of action for deceit," that is, "knowledge or belief on the part of the defendant that the representation is false." 362 F.3d at 1183 (alteration omitted). Such evidence of knowing deceit is what the district court demanded of Warmenhoven here: "Plaintiffs have not submitted any evidence, and none appears in the record, suggesting that NetApp did not intend to provide

lifetime medical benefits under the Plan when it was adopted." *Gomo*, 2019 WL 4346581, at *12. Yet, as we explained in *Mathews*, "[i]n articulating Ninth Circuit law in this area, we have followed a line of cases from our sister circuits that does not require a showing of intent." 362 F.3d at 1183.

In *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439 (6th Cir. 2002), one of the out-of-circuit cases we approved in *Mathews*, company management made repeated oral promises that, if employees took early retirement, their health benefits would continue unchanged "during retirement" and "during their lifetimes." *Id.* at 443–44. But in fact, the plan documents allowed amendments to the health benefit plan, and, after the plaintiff employees retired, the company raised the costs to them of securing health benefits. *Id.* at 442, 444–45. The Sixth Circuit held that the company thereby breached its fiduciary duty under § 1104(a)(1). *Id.* at 448, 455. In so holding, the court rejected any scienter requirement: "A fiduciary breaches his duty by providing plan participants with materially misleading information, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally." *Id.* at 449 (quotation marks omitted). And the court held that the company breached its fiduciary duty by "provid[ing], on its own initiative, materially misleading and inaccurate information about the plan benefits." *Id.* at 455.

Returning to our precedents, the health care plan in *King* denied coverage for a substantial medical bill on the ground that the participant had reached her lifetime cap on benefits. 871 F.3d at 737–38. We held that the participant had a viable fiduciary duty claim, explaining that although the plan documents could be interpreted to impose a lifetime benefit

cap, *id.* at 734–36, the documents' lack of clarity on that point violated the employer's and the plan's fiduciary duties of disclosure, *id.* at 745. In support, we observed that "[f]iduciaries breach their duties [under § 1104(a)] if they mislead plan participants or misrepresent the terms or administration of a plan," *id.* at 744 (quoting *Barker*, 64 F.3d at 1403), and that the employer and the plan had failed "to 'provide sufficiently detailed information' about whether the lifetime benefit maximum applied," *id.* at 745 (quoting *Farr v. U.S. W. Commc'ns, Inc.*, 151 F.3d 908, 915 (9th Cir. 1998)). Nowhere did *King* suggest that the defendants harbored an intent to deceive plan participants or that such intent was required to find a breach of fiduciary duty.

Under our circuit's precedents, then, Warmenhoven's fiduciary duty claim survives summary judgment on the remediable wrong issue, as there is a genuine dispute of material fact as to whether NetApp incorrectly represented to Plan participants that the Plan provided lifetime health insurance benefits. A reasonable factfinder easily could read the PowerPoints to convey a promise of lifetime benefits. Yet NetApp had not memorialized that promise in any plan document, and in fact the certificates of coverage said the opposite. Our circuit law does not immunize NetApp from liability for its false promises simply because it harbored no ill will or intent to deceive. A reasonable factfinder could conclude that NetApp failed "to convey complete and accurate information material to [Warmenhoven's] circumstance," *Barker*, 64 F.3d at 1403, and thus find a violation of § 1104(a)(1) and a remediable wrong under § 1132(a)(3).

The district court also held that Warmenhoven's fiduciary duty claim failed because he could have examined the certificates of coverage—which provided that the Plan

could be terminated at any time—to dispel any misunderstanding arising from the PowerPoints. In *Pirelli*, the Sixth Circuit rejected the notion that "a reservation of rights provision in the plan" automatically insulates the employer from liability under § 1104(a)(1) if the employer provides "false or inaccurate information about the future benefits of a plan." 305 F.3d at 455.

The district court read our decision in *Pisciotta v. Teledyne Industries, Inc.*, 91 F.3d 1326 (9th Cir. 1996), to hold otherwise, citing it for the proposition that "a reservation of rights contained in the Plan document is effective if the document was available for review." *Gomo*, 2019 WL 4346581, at *12 (citing *Pisciotta*, 91 F.3d at 1331). But *Pisciotta* did not so hold as to a fiduciary duty claim under § 1132(a)(3), as we addressed in that case only a direct claim for benefits under § 1132(a)(1)(B). 91 F.3d at 1329–31. In fact, when the plaintiffs in *Pisciotta* filed suit, our pre-*Varity* circuit precedent did not permit § 1132(a)(3) claims for individual relief by participants harmed by alleged breaches of fiduciary duty. *See Williams v. Caterpillar, Inc.*, 944 F.2d 658, 665 (9th Cir. 1991) (holding that "a fiduciary's duty under ERISA runs to the plan as a whole and not to the individual beneficiary"), *abrogated in part by Varity*, 516 U.S. 489.

In sum, that NetApp lacked an intent to deceive and that Warmenhoven could have reviewed the certificates of coverage do not necessarily defeat his § 1132(a)(3) claim based on NetApp's misrepresentations in the PowerPoints. To be clear, we do not pronounce on the ultimate question of whether Warmenhoven will succeed, as certain aspects of that claim may remain unresolved. On remand, NetApp may press that issue or any other non-waived defenses it might have, and we do not prejudge the result.

**B.  Appropriate Equitable Relief**

After holding that no reasonable factfinder could conclude that Warmenhoven suffered a remediable wrong, the district court declined to address whether he would be entitled to appropriate equitable relief to redress any such wrong.  2019 WL 4346581, at *13.  Warmenhoven's initial brief does not address the remedy prong, either.  NetApp argues that Warmenhoven thereby forfeited any argument that the district court's treatment of the remediable wrong prong prejudiced him, requiring that summary judgment on the § 1132(a)(3) claim be affirmed.

We rejected a materially identical argument in *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010), and do so again here.  The appellees in *Rodriguez* argued for affirmance of the district court's judgment on a ground not reached by the district court and contended that the appellant had waived any opposition to that argument by not anticipating it in his initial brief.  *Id.* at 1118 & n.6.  We disposed of the appellees' "groundless" contention in a footnote:

> We have previously held that the failure of a party in its opening brief to challenge an alternate ground for a district court's ruling *given by the district court* waives that challenge. . . .  Petitioner does not waive a challenge to any ground for [the district court's ruling] in its opening brief on appeal that was not relied on in the district court's order.

*Id.* at 1118 n.6.  NetApp is thus wrong to suggest that an appellant must address all *possible* alternate grounds for affirmance—even those not ruled upon by the district court—in an opening brief.

Beyond forfeiture, the parties do not discuss the merits of the remedy prong.  In *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), the Supreme Court identified three traditional equitable remedies available under § 1132(a)(3): reformation, equitable estoppel, and surcharge.  *Id.* at 440–42.  Especially because the parties do not address the issue on appeal, the proper course is to allow the district court to consider in the first instance the merits of NetApp's argument for summary judgment based on the remedy prong.  *See ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1079 (9th Cir. 2015) ("[T]he issue . . . was not fully briefed, and as it also has not been passed upon in the first instance by the district court, we decline to reach the issue."); *Reinkemeyer v. SAFECO Ins. Co. of Am.*, 166 F.3d 982, 985 (9th Cir. 1999) ("We decline to address the issue because it was not reached by the district court and was not fully briefed by the parties.").

### Conclusion

The district court's judgment is **AFFIRMED IN PART** as to Warmenhoven's § 1132(a)(1)(B) claim, and **VACATED IN PART** as to his § 1132(a)(3) claim.  The case is **REMANDED** to the district court for further proceedings consistent with this opinion.